IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| CLEAR CREEK INDEPENDENT SCHOOL DISTRICT, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. G-05-173 |
| J.K. b/n/f JOSE & ANA K., | § § § | |
| Defendants. | § § § | |

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This case comes before the Court as an appeal from the decision of a hearing officer at the Texas Education Agency in *Jose K. b.n.f Jose and Ana K. v. Clear Creek Independent School District*, Docket No. 085-SE-1104.  Now before the Court are Motions for Summary Judgment by Plaintiff and Defendants.  For the following reasons, Plaintiff's Motion is **GRANTED**, and Defendants' Motion is **DENIED**.

**I. Background**

J.K.'s parents, Jose and Ana K., requested an impartial due process hearing from TEA on November 16, 2004.  They alleged that Clear Creek Independent School District ("CCISD") violated J.K.'s right to a free appropriate public education ("FAPE") in four ways:  1) failure to provide extended school year services to prevent regression; 2) failure to provide appropriate in-home training; 3) failure to provide appropriate assistive technology; and 4) failure to provide appropriate community-based instruction.  (Decision, Vol. I at 9.)[1]  They did not challenge the adequacy of the

---

[1] The Court will cite to the administrative record with an abbreviated document title ("Decision") and the volume and page number.

1

Individual Education Plans ("IEPs") designed for J.K. (Resp't. Closing Argument, Vol. I at 51.) J.K. is classified as autistic, mentally retarded, and speech impaired. (Decision, Vol. I at 10.)

In 2002, J.K.'s IEP included 60 minutes a month of in-home training for the 2001-2002 school year and 30 minutes per month for the 2002-2003 school year, as well as 45 minutes of parent training every nine weeks for both school years.[2] (2002 IEP, Vol. III at 473.) In March 2003, his IEP Supplement revised his in-home training schedule to 30 minutes every nine weeks to be provided at school and his parent training schedule to 30 minutes every nine weeks (consisting of parent/staff meetings). (2003 IEP Supplement, Vol. II at 123.) The IEP projected that the parents would have three to four opportunities to develop strategies for helping J.K. to accomplish routine tasks and also to confer with staff to discuss progress or concerns. (2003 IEP, Vol. II at 125.) By the last progress review listed on the March 2003 IEP, the parents had met the goals related to the parent training. (2003 IEP, Vol. II at 125.)

The in-home trainer observed J.K. at school on September 8, 2003 and spoke with his parents about her observations. She visited J.K. at home on October 10, 2003. Parent training took place on December 12, 2003. On January 12, 2004, the in-home trainer spent six hours at a workshop on training techniques at the parents' request; the parents apparently met with her at this time. (Decision, Vol. I at 11.)

In March 2004, the Admission, Review, and Dismissal Committee ("ARDC"), the legal entity charged with preparing J.K.'s IEP, omitted the in-home training schedule and left only parent training, at the parents' request. (Decision, Vol. I at 11; ARD/IEP Supplement, Vol. II at 99.) The 2004 IEP Supplement did not schedule parent training per se, but it included a meeting between the parents and the trainer once every nine-week grading period.

In the 2003 and 2004 IEP Supplements, one of J.K.'s goals was to initiate communication

---

[2]J.K. and his parents cannot challenge any actions more than one year before November 16, 2004, the date they requested a hearing. *See* 19 Tex. Admin. Code. § 89.1151(c) (2001).

about needing to go to the bathroom. (Decision, Vol. I at 11; 2004 IEP, Vol. II at 84; 2003 IEP, Vol. II at 111.)  Beginning in the spring of 2003, J.K.'s teacher began teaching him to use the BIGmack voice-output device to communicate this need. (Decision, Vol. I at 12.)  In the spring of 2004, CCISD gave J.K.'s parents an additional BIGmack for him to use at home. (Decision, Vol. I at 12.)  On April 28, 2004, four staff members met with J.K.'s mother to explain, among other things, the proper use of the BIGmack device.

J.K. also used the device during his extended school year program in summer 2004. (Decision, Vol. I at 12.)  At some point during that summer, J.K. regressed in his ability to use the device at home. (Decision, Vol. I at 13.)  When he returned to school for the 2004-2005 term, his teacher noticed that he had also regressed in his ability to use it successfully at school. (Decision, Vol. I at 13.)

Overall, J.K. showed progress at school during this time.  His March 2004 IEP included an evaluation/assessment section based on information from the student and the parents stating that he was "doing better in general." (2004 IEP, Vol. II at 74.)  The IEP also stated that his teacher was proud of his growth.  He showed at least some progress on each short-term objective that had been addressed at both his October 2004 and May 2004 progress reviews. (2004 IEP, Vol. II at 76-89.)  The only indication of regression on any skill in the 2004 IEP is a set of statements in the IEP Supplement that J.K. experienced a decline in personal health skills over weekends and when he was not in school on a regular basis. (2004 IEP, Vol. II at 95.)  His March 2003 IEP shows much the same information.  School personnel reported that he made "a lot of progress." (2003 IEP, Vol. II at 106.)  Again, he made at least some progress on all the objectives that were addressed. (2003 IEP, Vol. II at 108-118.)  No mention was made of any concern about his personal health skills.

The hearing officer determined that CCISD denied J.K. an FAPE because CCISD did not provide appropriate in-home training, but he denied the parents' claims on all other grounds.  He ordered CCISD to provide 150 minutes of compensatory in-home or parent training, based on his calculation that only four of ten scheduled 30-minute parent or in-home training sessions were

3

provided pursuant to the March 3, 2003 IEP.

**II. Legal Standard**

The Individuals with Disabilities Education Act, 20 U.S.C. § 1415(i)(2)(A) ("IDEA"), allows an party aggrieved by the decision of a hearing officer to file a civil action in federal court. A district court's review of a hearing officer's decision is "virtually de novo." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993); *see also Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F.*, 118 F.3d 245, 252 (5th Cir. 1997). The district court must give the officer's decision "due weight," but it must nonetheless reach its own conclusion based on the preponderance of the evidence. *Michael F,*. 118 F.3d at 252 (quoting *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034, 3050-51, 73 L. Ed. 2d 690 (1982)). The IDEA defines a free appropriate education ("FAPE") as:

> special education and related services that–
> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(8). "Special education" includes "instruction conducted in the classroom, in the home . . . and in other settings." 20 U.S.C. § 1401(25). States must provide an FAPE to children with disabilities if they accept federal assistance under the IDEA. *See* 20 U.S.C. § 1412; *Michael F.*, 118 F.3d at 247.

An FAPE is one "that is specifically designed to meet the child's unique needs, supported by services that will permit him 'to benefit' from the instruction." *Michael F.*, 118 F.3d at 247-48; *see also Bonnie Ann F. ex rel. John R.F. v. Calallen Indep. Sch. Dist.*, 835 F. Supp. 340, 346 (S.D.

Tex. 1993). A challenge to an IEP, the document through which an FAPE is designed, can attack the procedures by which the IEP was created or whether the IEP was reasonably calculated to provide educational benefits to the child. *See Michael F.*, 118 F.3d at 248. The fairness of the procedure is not at issue here.[3] The Court must consider four factors in deciding whether the IEP was reasonably calculated to provide educational benefits: (1) whether the IEP was individualized based on the child's assessment and performance; (2) whether it provided for placement in the least restrictive environment; (3) whether "the services [were] provided in a coordinated and collaborative manner by the key 'stakeholders'"; and (4) whether the child received academic and non-academic benefits. *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 347-48 (5th Cir. 2000). Maximization of the child's potential is not required. *See Teague*, 999 F.2d at 132.

Actual implementation of the IEP is important. *See* 20 U.S.C. § 1401(8); *Bobby R.,* 200 F.3d at 348; *Socorro Indep. Sch. Dist. v. Angelic Y. ex rel. Angela T.*, 107 F. Supp. 2d 761, 767 (W.D. Tex. 2000). However, an FAPE does not demand that every element of the IEP be implemented. The Fifth Circuit has held that "a party challenging the implementation of an IEP must show more than a de minimis failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." *Bobby R.*, 200 F.3d at 349. Generally, "[a]ll that a school is required to do is ensure that its students are receiving educational benefit." *Sylvie M. ex rel. Diane R. v. Bd. of Educ. of Dripping*

---

[3] At the hearing, J.K.'s parents apparently challenged both the substantive adequacy of the in-home training and also the IEP process. They argued that they were denied full participation in the development of the IEP because CCISD did not explain that they could receive both in-home and parent training. (Decision, Vol. I at 14.) The hearing officer dismissed this claim, though, and since CCISD has only appealed the officer's decision on the adequacy of the training provided, the question of whether the IEP process was proper is not before the Court.

*Springs Indep. Sch. Dist.*, 48 F. Supp. 2d 681, 698 (W.D. Tex. 1999). A child need not "improve in *every* area to obtain an educational benefit from his IEP." *Bobby R.*, 200 F.3d at 350.

An FAPE does not guarantee a particular outcome. *See Rowley*, 458 U.S. at 192, 102 S. Ct. at 3043; *Samuel Tyler W. ex rel. Harvey W. v. Northwest Indep. Sch. Dist.*, 202 F. Supp. 2d 557, 559 (N.D. Tex. 2002) ("No school can guarantee that an IEP will be successful."). The IDEA does not impose a "substantive educational standard upon the States." *Rowley*, 458 U.S. at 200, 102 S. Ct. at 3048. An FAPE, therefore, does not mean the best education a school district might provide. *See Samuel Tyler W.*, 202 F. Supp. 2d at 563 ("As defendant has repeatedly noted, the law does not require that it provide the plaintiff a Cadillac, although that is surely what every parent would want."). 19 Tex. Admin. Code § 89.1055 (2004) requires that the IEP for a child with autism or pervasive developmental disorders consider and, if appropriate, include in-home and parent training. While the provision of in-home services may be necessary for an FAPE, the fact that a different IEP might recommend more in-home services does not invalidate an otherwise valid IEP. *See Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 627 (6th Cir. 1990).

In deciding whether a disabled child has received an FAPE, the Court should consider the balance between the requirement to provide a meaningful education to each child and the "realities of limited funding" that school districts face. *Stacey G. ex rel. William & Jane G. v. Pasadena Indep. Sch. Dist.*, 547 F. Supp. 61, 78 (S.D. Tex. 1982). Not only do school districts have limited funds overall, but "[e]xcessive expenditures made to meet the needs of one handicapped child may reduce the resources that can be spent to meet the needs of other handicapped children." *Id.*

Finally, the Court will not decide whether a particular methodology would have been better than the one actually used; this is a matter for the school district. *See Rowley,* 458 U.S. at 207, 102

6

S. Ct. at 3051; *Bonnie Ann F.*, 835 F. Supp. 2d at 347; *Samuel Tyler W.*, 202 F. Supp. 2d at 563. The methods used during in-home or parent training is not a proper matter for the Court's consideration.

**III. Analysis**

*A. Denial of an FAPE*

J.K.'s parents have not contested the adequacy of the IEPs with regard to in-home or parent training. The only issue is whether the implementation of the IEPs' schedule of parent and in-home training violated J.K.'s right to an FAPE. The failure to implement these provisions must have been more than de minimis for the parents to prevail. *See Bobby R.*, 200 F.3d at 349. The standards for an acceptable IEP also inform the Court's decision on the adequacy of implementation; if the IEP would have been acceptable with the level of services actually provided, then the implementation must have been adequate.

The hearing officer set out several reasons for his decision that the implementation was inadequate. First, he emphasized the inconsistent location of the in-home and parent training despite the 2003 IEP's statement that the "in-home" training would be done at school. (Decision, Vol. I at 14-15.) While it may be true that consistency in methodology is important in working with autistic children, there is no evidence that the varying locations of the training affected J.K.'s learning at all. Nor does it appear that J.K.'s parents took issue with the locations; in fact, they suggested that the in-home trainer attend the January 2004 workshop. The variance in locations is a de minimis failure to implement the IEP, if it is even a failure at all.

Also, the hearing officer attributed J.K.'s regression in toileting skills to the parents' failure to understand how to use the BIGmack device, which he in turn attributed to the inadequate training. (Decision, Vol. I at 15.) The regression, though, may have been due to the nature of the services

provided during the extended school year program. There is some evidence that the summer teacher did not communicate with the regular-year teacher about the methods used with J.K.. However, the hearing officer found that the extended school year program was adequate. J.K. did not regress in his use of the device at school before his parents received one at home, nor is there evidence that he regressed between the time they received it in the spring of 2004 and the end of that regular school year or even during the extended school year program. (Decision, Vol. I at 16.) He regressed sometime between the end of the extended summer program and the beginning of the 2004-2005 school year.

The timeline does not provide firm support for a conclusion that the parents' activities caused the regression because the parents had the device for some time before his behavior regressed. Even if the parents' actions did contribute, J.K.'s father stated that at the beginning of the summer of 2004, he and J.K.'s mother followed a little bit different plan on teaching Jose toileting skills at home, based on CCISD's advice, but then they decided on their own to go back to the way they had done it before. (Transcript, Vol. V at 595-596.) The regression may also have been caused, then, by the parents' failure to follow CCISD's instructions rather than by a deficiency in those instructions. Plaintiffs simply have not shown that, by a preponderance of the evidence, the allegedly inadequate in-home or parent training caused J.K.'s regression in this area.

J.K.'s parents have not shown that J.K. received no benefit from the training provided. The standard for an IEP is whether the instruction and services provide some benefit to the student. The training apparently covered issues other than toileting, and there is no indication that J.K. did not benefit from the training on these other issues. J.K. did receive some educational benefit from 2003-2004, as shown by his progress on almost all of the objectives in his IEPs. An IEP and its

implementation cannot be judged based on a student's progress or regression on a single objective, even an important one. *See Bobby R.*, 200 F.3d at 350. Absent a showing that J.K. regressed overall or in several significant areas, the Court cannot find that the deficiency in parent or in-home training denied J.K. an FAPE.

Additionally, J.K.'s father stated during his testimony at the hearing that the one of the parents' main concerns about the lack of in-home or parent training was that they had not been able to get J.K. to use the BIGmack at home, so he was continuing to wet the bed every morning. (Transcript, Vol. V at 577-78.) CCISD is simply not responsible for every problem a child, even a special-needs child, has at home. Of course J.K.'s parents, like any good parents, wish that J.K. would not wet the bed. But CCISD cannot guarantee that this will not happen. *See Rowley*, 458 U.S. at 192, 102 S. Ct. at 3043. An IEP is not guaranteed to succeed, even if implemented fully, so the Court cannot rely on a child's failure to master a single specific task as a measure of the propriety of an IEP and its implementation. CCISD did work with J.K. on his toileting skills, so although additional parent training might have been helpful in this area, CCISD did not fail to implement the whole portion of the IEP dealing with these skills. In this case, failure to implement one of several strategies used to teach an important skill does not rise to the level of a failure to implement a significant portion of the IEP. *See Bobby R.*, 200 F.3d at 349.

J.K.'s father also stated that he and his wife signed the IEPs because they believed at the time that those represented the best approach for J.K. (Transcript, Vol. V at 581.) He did not like the in-home training that had been provided, so they asked for the parent training instead, a change that was reflected in the 2004 IEP. (Transcript, Vol. V at 603.) First, CCISD cannot know ex ante how a plan will turn out. If the school staff and the parents believed that parent training would suffice, the

9

Court will not second-guess that decision. The school staff and the parents are in the best position to determine which methodology should be used. *See Rowley,* 458 U.S. at 207, 102 S. Ct. at 3051. Second, if J.K.'s parents felt that the in-home training was poorly implemented, they should have articulated those specific concerns to CCISD at the time instead of just asking for a change in the type of programming. Without notice of the problems, CCISD could not provide more helpful training.

J.K.'s parents have not shown that the reduced number of parent and in-home training sessions denied J.K. an FAPE. They have not shown: that the failure to implement the IEP was more than de minimis; that J.K. did not receive at least some educational benefit from the training sessions that did take place; or that J.K. did not receive at least some educational benefit from his overall program. It is apparent from J.K.'s records that CCISD provided significant special services to J.K. that allowed him to develop new and important skills. CCISD is not obligated to provide every possible service or the very best education that might be desired for J.K. Plaintiff's Motion for Summary Judgment is therefore **GRANTED**, and Defendant's Motion is **DENIED**.

*B. Attorney's Fees*

20 U.S.C. § 1415(i)(3)(B) authorizes the Court to award, in its discretion, attorney's fees to the parents of a child with a disability who is a prevailing party. J.K.'s parents have asked the Court to award them reasonable attorney's fees because they prevailed on a significant issue at the hearing. J.K.'s parents have not prevailed in this action, though, and for that reason the Court respectfully declines to award them attorney's fees. Each Party is to bear its own costs, expenses, and attorney's fees incurred herein to date.

**IV. Conclusion**

The Court deeply sympathizes with the plight of J.K.'s parents. Raising not one but two special-needs children must be a tremendous burden, and the Court commends the parents for their compassionate practical involvement and their vociferous advocacy on behalf of both their children. However, the State is simply not obligated to design and implement a perfect education for every child. No child receives all the educational services that might be desired. This is the reality of the State's limited budget.

For the above-stated reasons, Plaintiff's Motion for Summary Judgment is hereby **GRANTED**, and Defendants' Motion for Summary Judgment is respectfully **DENIED**. The decision of the hearing officer that Plaintiff denied Defendant a free appropriate education and that Defendant should be awarded 150 minutes of compensatory in-home training is **VACATED**. Each Party is to bear its own taxable costs, expenses, and attorney's fees incurred herein to date. A Final Judgment will be issued contemporaneously with this Order.

**IT IS SO ORDERED.**

**DONE** this 16th day of August, 2005, at Galveston, Texas.

_____
Samuel B. Kent
United States District Judge